SUCESIÓN PEDRO GIUSTI, INC., Petitioner, v. TAX COURT OF PUERTO RICO, ETC., Respondent; RAFAEL BUSCAGLIA, TREASURER OF PUERTO RICO, Intervener.

No. 195. Argued April 18, 1949.—Decided June 23, 1949.

*Córdova & González* and *Hernán R. Franco* ,for petitioner.
*Vicente Géigel Polanco, Attorney General (José C. Aponte,*

*Acting Attorney General,* in the brief) and *J. B. Fernández Badillo, Assistant Attorney General,* for intervener, respondent in the main action. *Rafael O. Fernández* as *amicus curiae.*

MR. JUSTICE SNYDER delivered the opinion of the Court.

The question presented is whether shares of stock of a domestic corporation in the hands of its stockholders are subject to our property tax.

We granted the petition for certiorari of Sucesión de Pedro Giusti, Inc., a domestic corporation, to review the decision of the Tax Court upholding the determination by the Treasurer that it must pay for 1945–46 a property tax of approximately $3,800 on stock of other domestic corporations which the taxpayer owned on January 15, 1945 and which were valued at approximately $140,000.

▌ Shares of stock are subject to the property tax in the hands of stockholders by virtue of §§ 285 and 290 of the Political Code.[1] But § 291 (*d*) provides for exemption from taxation of *"shares of capital or stock in . . .* corporations . . . organized under the laws of Porto Rico when the property of such corporation is exempt or *when such shares are taxable* to said . . . *corporations . . . themselves,* to the extent and in the manner prescribed in Section 316 of

---

[1] The Political Code, enacted in 1902, inclusive Title IX, entitled Revenues. Chapter I of this title, entitled Assessment of Property, consists of §§ 285–355. Most of the Sections involved in this case were amended by the Act of March 10, 1904, Laws of Puerto Rico, 1904, p. 167. When citing these Sections, we refer to the version found in Compilation of the Revised Statutes and Codes of 1911, pp. 549–72.

Section 285 provides for a tax "upon the value of all real and personal property in Porto Rico, and of all personal property of persons residing in Porto Rico, to be ascertained as hereinafter provided, not hereinafter exempted from taxation."

Section 290 provides that "all property not expressly exempted from taxation shall be assessed and taxed." After defining real property for purposes of this tax, § 290 provides that personal property shall include, among other things, stocks; but that it "shall not include book-credits, promissory notes nor other personal credits."

this Title." (Italics ours).[2] The principal question here is whether the stock owned by the petitioner is exempt on the ground that "such shares are taxable to the corporation itself."

■ In opposing this exemption, the Treasurer argues that the language of § 291 (d) is doubtful or ambiguous. He places great reliance on the well-established proposition that tax exemptions cannot be inferred; they must be specifically provided for in plain and unambiguous language, which is strictly construed. *Puerto Rico Ilustrado* v. *Buscaglia, Treas.*, 64 P.R.R. 870, 874; *Crown Beverages* v. *Buscaglia, Treas.*, 65 P.R.R. 766, 770, footnote 5; *Ochoa Fertilizer Corporation* v. *Tax Court*, 68 P.R.R. 394, 401; *Buscaglia* v. *Tax Court*, 68 P.R.R. 34, 36, and cases cited. But taxation is a complicated subject. Frequently the language of tax statutes is necessarily involved and difficult to understand. We are not entitled to defeat the intention of the Legislative Assembly by characterizing language as ambiguous merely because it is complicated. Instead it is our function to find if we can the true intent of the Legislature. *Destilería Serrallés, Inc.* v. *Tax Court, ante,* p. 65. In addition, although § 291 (d) is couched in the language of exemption, this is not a typical problem of tax exemption. Rather, as we shall presently see, the question is whether the Legislature affirmatively and specifically intended to tax both the property of domestic corporations and the shares of their stockholders, or only one of them.

■ The next point discussed is the question of "double taxation". The Treasurer does not dispute the proposition

---

[2] This Section was originally enacted in 1902 in English. We have therefore replaced the Spanish version thereof with a corrected translation.

The 1902 Spanish version includes a reference to § 322. But this is improper as the 1902 English version contains no such reference. In the same way, the references to § 322 in the Spanish version of the Compilations of the Revised Statutes and Codes of 1911, p. 582, and of 1941, p. 403, should not have been included.

that the legislative intent to impose double taxation must. be clear and explicit and is never presumed. *P. R. & Am. Ins. Co.* v. *Gallardo, Treas.*, 35 P.R.R. 842, 853–54, hereinafter discussed in detail on other points; *People* v. *Irizarry*, 46 P.R.R. 867; *Tennessee* v. *Whitworth*, 117 U. S. 129; *Leader* v. *Blander*, 77 N.E. (2) 69 (Ohio, 1948); 14 Fletcher, Cyclopedia Corporations, § 6939, p. 598. However, the Treasurer contends that taxation of the property of the corporation to the latter and taxation of its stock to the shareholders does not constitute double taxation. Consequently, according to the Treasurer, the rule that the intent to impose double taxation must be clear and explicit does not apply to this case.

██ But in appraising this argument of the Treasurer, it is important to understand what is meant by "double taxation". That phrase has varied meanings, depending on the context in which it is used. In the first place, in some states it is used in interpreting a constitutional inhibition against double taxation. Haglund, Double Taxation, 8 So.Calif.L. Rev. 79, 80, citing cases in footnote 5. But we put that question aside here, as there is no constitutional prohibition against double taxation by our Legislature. *Monllor & Boscio Sucrs.* v. *Sancho, Treas.*, 61 P.R.R. 63, 65–66, affirmed in 136 F. 2d 114 (C.C.A. 1, 1943).

██ The second manner of using this phrase is in determining if double taxation exists in the strictly legal sense. This likewise presents no problem in this case. The parties agree that to tax both the property of a corporation and the shares of the stockholders does not constitute double taxation, *legally speaking*, as such taxes are on different persons and on different property. *Bank of Commerce* v. *Tennessee*, 161 U. S. 134, 146; *Owensboro National Bank* v. *Owensboro*, 173 U. S. 664; *Hawley* v. *Malden*, 232 U. S. 1; *Klein* v. *Board of Supervisors*, 282 U. S. 19; Annotation 43 A.L.R. 686, 694, 700; 58 L.R.A. 513, 589 *et seq.*; 60 L.R.A. 321, 366–67; 7 Ann. Cases 1195; 14 Fletcher, *supra*, § 6939,

pp. 598–99; Ballantine on Corporations, § 122, p. 292; *Monllor & Boscio Sucrs.* v. *Sancho, Treas.*, *supra*, p. 66 *et seq.*; *P.R. Iron Works* v. *Buscaglia, Treas.*, 62 P.R.R. 839, 850–51; *Barceló & Cía., S. en C.* v. *Buscaglia, Treas.*, 67 P.R.R. 100, 109, affirmed in 169 F. 2d 82 (C.C.A. 1, 1948).

The earlier cases utilized the concept of "double taxation" in the third sense. Even though (1) there was no constitutional inhibition against double taxation and (2) there was no double taxation in the strictly legal sense, those cases labelled as "double taxation" taxes which were double in the broad sense by virtue of their economic impact. Those cases did not say that such taxes may not be validly imposed. But they did require the intent to impose them to be clear and explicit.

■ This third view of "double taxation" applies here. In 1902, when our statute was enacted, many state statutes taxed either corporate property or stock in the hands of shareholders, but not both. Their theory was that taxation of both, although valid, would be double taxation in the economic sense. Haglund, Double Taxation, 8 So.Calif.L. Rev. 79, 83–84, citing cases from a number of states in footnotes 10, 11; 35 Ill.L.Rev. 716, 727; Fordham and Lob, Some Plain Talk About the Louisiana General Property Tax, IV La.L.Rev. 469, 473, footnote 11; 14 Fletcher, *supra*, § 7000, pp. 860–61. And the pertinent Sections of our Political Code were obviously modelled after similar statutes of that era.

Citing *Tennessee* v. *Whitworth*, *supra*, and *Board of Com'rs of Oklahoma Country* v. *Ryan*, 232 P. 834 (Okla., 1925), 14 Fletcher, *supra*, § 6939, p. 598, summarizes this point of view as follows: "In many states, statutes expressly provide that shares of stock are not taxable in the hands of stockholders if the corporate property is taxed to the corporation in the state. Such statutes are intended to prevent double taxation. Statutes will not be construed to authorize taxation of both the property of the corporation

and the shares of the individual stockholder unless the intent of the legislature to that effect is plainly and unequivocally stated."

The *amicus curiae* suggested at the oral argument that our statute resembled most the Pennsylvania statute.[3] Our research has indicated that Pennsylvania was among the states which used the foregoing approach to this problem at the turn of the century. Its statute, enacted in 1891 and amended in 1893, taxed "shares of stock . . . except shares of stock in any corporation or limited partnership liable to the capital stock tax . . . ". In *Commonwealth* v. *Fall Brook Coal Co.*, 26 A. 1071 (Pa., 1893), the court held that under this statute stock of a domestic corporation could not be taxed in the hands of the owners thereof if the corporation had paid the capital stock tax. In the course of its opinion the court stated at pp. 1071–72 that the property of a corporation, like that of a trust, is "a single estate" which "may well be taxed in the name of the corporation, the legal owner, or the names of the shareholders, the equitable owners . . . Whatever method may be adopted, the same capital is reached, and the ultimate burden rests on the same persons. It is clear, therefore, that to tax the capital stock in the hands of the corporation, and then tax the owners of the parts or shares into which it is divided, upon their respective holdings in the same capital, is double taxation, pure and simple."

The court then went on to say (p. 1072) "that the legislature has power to impose double taxation . . . But an intent to impose double taxation will not be presumed. *Safe-Deposit Co.* v. *Loughlin*, 139 Pa. St. 612, 21 Atl. Rep. 163. The presumption is against the existence of such an intention, and this presumption will prevail until it is overcome by express words showing an intent to impose double tax-

---

[3] Others have asserted that our statute was modelled after the Montana statute. See *Daily Bank & Trust Co.* v. *Board of Com'rs.*, 81 P? 950 (Mont., 1905).

ation." And see Notes, 88 U.Pa.L.Rev. 456, 458; 88 U.Pa. L.Rev. 758.

There is another illustration of this earlier view frowning upon double taxation in its economic effect. Some state constitutions provided that all property must be taxed, including shares of stock. Despite such constitutional provisions, the majority of the courts concluded that failure of the Legislature to tax the shareholders' interest, or even express statutory exemptions thereof, did not violate such state constitutions. Here again the theory of the legislatures and courts was that a tax on the property of the corporation was in practical effect a tax on the shares of the stockholders, and that to assess both would be to tax the same property twice. Comments, Corporate Stock and the Louisiana Property Tax, IV La.L.Rev. 110, 113, citing cases from various states in footnotes 15 and 17; *Crocker* v. *Scott*, 87 P. 102 (Calif., 1906); *Cheeseborough* v. *City and County of San Francisco*, 96 P. 288 (Calif., 1908); Stimson, Exemption From the Property Tax in California, 21 Calif.L.Rev. 192, 200, 204–5, 220; Note, 16 Calif.L.Rev. 301, 304–5.[4]

In view of the foregoing, we think this case calls for application of the principle that although double taxation is valid, there is a presumption against it and it must be expressly and clearly imposed. As we have seen, the Treasurer argues that this rule does not apply here because different taxes on corporations and its shareholders are not

---

[4] Typical of the reasoning used to justify this result is the language found in *Burke* v. *Badlam*, 57 Cal. 594, 601–2 (1881): " . . . what is the stock of a corporation but its property? . . . When . . . all of the property of the corporation is assessed . . . then all of the stock of the corporation is assessed, and the mandate of the Constitution is complied with. . . . When the property of the corporation is assessed to it, and the tax thereon paid, who but the stockholders pay it? . . . To assess all of the corporate property . . . and also to assess to each of the stockholders the number of shares held by him, would, it is manifest, be assessing the same property twice . . . the Legislature . . . has not attempted to exempt any property from taxation . . . It has only said that the property shall be assessed to the corporation, and shall not be again assessed . . . ".

legally double taxation. But the test here is not legal. Nor is it related to our present views. Rather the point is that the legislatures of that day, including ours, thought of the two taxes in question as double taxation, economically speaking. We must therefore find that the intention to impose them was clear and explicit.

We are not suggesting that either this Court or the Legislature of today subscribes to the view, which was widely prevailing a half century ago, that a tax on the property of a corporation and a tax on shares in the hands of stockholders are taxes on the same property and therefore constitute double taxation, either legally or economically speaking. On the contrary, today we would say, for purposes of property taxation at least, that the "corporation 'owns' its assets; the shareholder 'owns' his stock". 35 Ill.L.Rev. 716, 717, 723. But this is not a constitution we are expounding, in which the same language must be interpreted every generation in accordance with the necessities of the times. It is a tax statute which is subject to amendment and was written in the light of the thinking of 1902. To determine its meaning we must ascertain, if we can, what was in the minds of the men who wrote it in 1902. On that point, it is significant that, while not as crystal clear as the Pennsylvania statute, § 291 (d) follows the pattern of state statutes of that period by exempting shares in the hands of the owners thereof when "such shares are taxable to the corporation itself".

■ Examination of our statute Section by Section discloses that our Legislature was imbued with the 1902 philosophy we have described. Section 291 (d) exempts from taxation "Shares of capital or stock . . . when such shares are taxable to [the] . . . corporations . . . themselves, to the extent and in the manner prescribed in section 316 . . . ". At the threshold of this analysis of our statute, it must be confessed that there is no provision of the Political Code which uses the exact terminology of § 291 (d) and taxes

shares to the corporation itself. Moreover, § 316, standing alone, is of no substantial aid as it provides only that real estate of corporations shall be assessed. But we must read the statute as a whole. The very next Section, § 317, when read together with § 316, furnishes the clue as to the intent of the Legislature. It provides for assessment of the personal property of corporations. Under it the "capital" of corporations is ascertained by using (1) the value of the "capital stock" plus the bonds, surplus and undivided profits, or (2) the value of the real and personal property, whichever is higher, after deducting the value of the real property under both formulae.[5]

We thus see that under §§ 316 and 317 all the property, real and personal, of a domestic corporation is subject to the property tax.[6] Moreover, by using the value of "capital stock", etc., as one of the alternatives in measuring the value of the personal property, the Legislature demonstrated that it was in substance following the lead of state statutes in

---

[5] Section 317 reads as follows: "The personal property of . . . corporations . . . incorporated under the laws of Porto Rico other than banking institutions having a share capital shall be assessed to such . . . corporations . . . by the Treasurer of Porto Rico in the manner provided by this Section. The actual present value of *the capital* of such corporations shall be ascertained by the Treasurer of Porto Rico from the sworn declarations of the presidents, directors or other chief officers of such corporations as required by Section 319, and from such other reliable information as the Treasurer may have or secure, and the present actual value shall in no case be less than the value of *the capital stock* and bonds plus the surplus and undivided earnings of said . . . corporations . . ., nor less than the market value of the real and personal property of said . . . corporations . . ., including in personal property rights, franchises and concessions. From the valuation thus obtained shall be deducted the total valuation of real property of said corporations, as ascertained in accordance with the provisions of Section 316, and the remainder shall be deemed to represent the personal property of said corporations for purposes of taxation." (Italics ours).

[6] This is of course subject to the constitutional inhibition against taxation by Puerto Rico of tangible personal property belonging to its domiciliaries but permanently located elsewhere. *Ballester Hermanos v. Tax Court*, 66 P.R.R. 531, 534, 535–36, reversed on other grounds but affirmed as to this point, 162 F. 2d 805, 806 (C.C.A. 1, 1947), cert. denied 332 U. S. 816.

imposing a tax on "capital stock". This becomes even more evident when we bear in mind that a tax on "capital" or on "capital stock" is in effect a tax on the property of the corporation, and that the courts use the terms interchangeably. *P. R. & Am. Ins. Co.* v. *Gallardo, Treas.*, 35 P.R.R. 842, 850–53; Hodes, The Illinois Capital Stock Tax, 28 Ill.L. Rev. 332, 337–38; Notes, 88 U.Pa.L.Rev. 456, 457; 2 Cooley, Taxation, 4th ed., §§ 869–70, pp. 1754–56; id., § 876, pp. 1760–2; *Commonwealth* v. *Union Shipbuilding Co.*, 114 A. 257, 258 (Pa., 1921); *Wright* v. *Georgia R.R. & Banking Co.*, 216 U. S. 420, 425; *Delaware, L. & R. R. Co.* v. *Pennsylvania*, 198 U. S. 341, 353–54, 357; 58 L.R.A. 513 *et seq.* See 14 Fletcher, *supra*, §§ 6961–62, pp. 680–91. As the New York Court of Appeals has pointed out in discussing such a tax, capital stock "is an unfortunate expression interpreted to mean property rather than shares of capital stock . . . ". *People* v. *Cantor*, 141 N.E. 901, 903 (N.Y., 1923).

In view of the foregoing, we may, for present purposes at least, treat the property tax, imposed by §§ 316–17, as a tax on capital stock. As such, we think the tax paid by the corporation under §§ 316–17 was the tax which the Legislature had in mind when it provided in § 291 (d) that stock of domestic corporations in the hands of the stockholders shall be exempt "when such shares are taxable to the corporation itself."

■ The Treasurer dismisses § 317 by asserting that it merely imposes a property tax on the personal property of a corporation, and does not in so many words either "tax the shares to the corporation itself" or impose a tax on capital stock. But there is no mention of such a tax on the corporation itself in any section other than § 317. Consequently, to agree with the Treasurer's interpretation of § 317 would require us to hold that the portion of § 291 (d) conferring this exemption is meaningless. However, it is our duty to find some meaning, if it is reasonably clear, in this provision of § 291 (d). The matter admittedly is not free from diffi-

culty. But the effort of the Legislature to follow the lead and philosophy of the state statutes of that era is evident. Despite the ineptness of some of its language, we are therefore satisfied that the 1902 Legislature meant to provide that when a domestic corporation pays the taxes provided in §§ 316–17, the "shares" (*i.e.*, as understood in 1902, the properties represented by the shares) are considered as "taxed to the corporation itself" within the meaning of § 291(*d*), resulting in an exemption from taxation of the stock in the hands of the shareholders.

■ The Treasurer has another theory as to the proper interpretation of § 317, not wholly consistent with that just discussed. Treasury employees testified in the Tax Court that beginning with the fiscal year 1945–46, generally speaking, the policy of the Treasurer in collecting the property tax on corporations has been to assess non-banking corporations on the value of their physical properties, provided they make returns. For corporations which make no returns, the capital stock as it appears in the records of the Executive Secretary is used as the measure of the valuation of the personal property "in order not to fail to tax corporations which negligently have not filed returns". As to the stock in the hands of the shareholders, the property tax is assessed thereon if the corporation pays the property tax on the value of its physical properties, but not if the corporation pays it on the value of the capital stock.

On the basis of this testimony, the Treasurer argued and the Tax Court agreed that the taxpayer had not proved that it came within the exemption for shares of stock established by § 291(*d*). The court held that, "on the contrary, the evidence showed that the Treasurer assessed the property tax on shares of stock of domestic corporations only in the event the property tax had been assessed on said corporations on the value of its physical properties." While it does not say so explicitly, the Tax Court apparently agreed with the view

of the Treasurer, embodied in this new policy, that if the corporation paid its property tax measured by its capital stock, etc., shares in the hands of stockholders are exempt.

There are two fatal flaws in this policy of the Treasurer and the decision of the Tax Court in effect upholding it. In the first place, § 317 does not authorize the Treasurer in his discretion to select the value of the physical properties of a corporation as the measure of the property tax on the corporation. On the contrary, § 317 explicitly requires the Treasurer to use either (1) the value of the physical properties *or* (2) the value of the "capital stock" plus certain listed items, whichever is higher. The Treasurer cannot, ignoring the plain terms of § 317, discard the higher valuation of the capital stock, etc., and arbitrarily use the value of the physical properties in every case solely to avoid the exemption for shares of stock under § 291 (*d*). Indeed, if the statute had given the Treasurer such unfettered discretion, which it does not, to choose between the two alternatives, with exemption for stock flowing from one and taxability from the other, there would be serious doubt as to its constitutionality. *P. R. & Am. Ins. Co.* v. *Gallardo, Treas., supra,* 845–46, 854–55.

In the second place, the Treasurer and the Tax Court are mistaken as to the effect that calculating the property tax of a corporation on the basis of the valuation of its physical properties has on the taxability of stock in the hands of the shareholders. For reasons already stated, whichever of the alternatives contemplated by § 317 is used, stock of a domestic corporation is exempt if the latter pays the property tax pursuant to §§ 316–17.

Finally, an indication of the weakness of this theory of the Treasurer is the anomalous result to which it leads us. By simply failing to file a return, a corporation could give its stockholders an exemption from taxation of their stock. Aside from its doubtful constitutionality, we do not think

the Legislature intended for either the Treasurer or a taxpayer to have the choice of whether property shall be taxable or not.[7]

Examination of §§ 291(d) and 316–17, read in the light of the philosophy prevalent in 1902 and the state statutes which served as a model for these Sections, has led us to conclude that the Legislature intended to tax either the shares in the hands of stockholders or the property in the hands of the corporation, but not both. A related provision of § 291(d) points to the same result. The property of certain corporations is exempt from taxation under § 291(e). Following the then view that stock in the hands of shareholders represents this property, and to make effective this exemption of the property of the corporation, § 291(d) exempts the shares of such corporations in the hands of its stockholders.

Likewise § 317, in requiring deduction of the value of real estate from the value of the "capital" of the corporation as measured by the capital stock plus other items, discloses the intention of the Legislature to avoid taxing the real estate of the corporation twice, economically speaking.

This same purpose to avoid what the 1902 Legislature thought of as economic double taxation is also borne out by § 320. It provides that foreign corporations doing business in Puerto Rico, other than banking institutions having a share capital, shall be taxed in the same manner as domestic corporations, except that "in the determination of the actual

---

[7] The Tax Court concludes its opinion as follows: "Before us the issue has not been raised, either by the pleadings or by the testimony, as to whether the defendant has not acted in accordance with the provisions of Section 317 of the Political Code." We cannot agree. On the contrary, as already noted, the testimony shows that the Treasurer improperly attempted under § 317 to use the value of the physical properties as the measure of the tax on non-banking corporations which made a return instead of selecting the higher figure provided by the two alternatives, as required by § 317. Moreover, this question is argued in detail in the briefs submitted to the Tax Court by the taxpayer and the *amicus curiae*.

present value of the *capital* of such corporations only such part of the *capital* of such corporations shall be considered and assessed as is employed in the transaction of business in Porto Rico, but the amount of such capital shall in no case be less than the value of the real and personal property of such corporation or company situated in Porto Rico . . . ". (Italics ours).   Here again either the "capital" of foreign corporations used here or their property located in Puerto Rico, whichever has the higher value, is taxed, but not both.

This is also manifest in the treatment of banks.   Section 320 concludes with a provision that all the shares of stock in domestic and foreign banking corporations located or doing business in Puerto Rico shall be assessed to the owners thereof in the municipal districts where such banks are located, with a deduction for the proportionate value of real estate belonging to the bank.   The bank must pay this tax. However, it is entitled to reimbursement from the stockholder, and has a lien on his stock therefor.   Since the property, capital or capital stock (all synonymous for our purposes) of a banking corporation is exempt from taxation under § 320, the property of banks, represented by its stock, is taxed to the *stockholders;* but the value of the real estate belonging to the *bank* is deducted.   Once more, the Legislature was avoiding taxing twice what it then considered from the economic point of view to be the same thing—property of the bank as against shares of stockholders.   That could be the only reason it permitted a *stockholder* to deduct from *his* tax the value of real estate belonging to the *bank.*

We find the same situation in § 321, which provides for taxation of railroad companies.   It lays down the method for assessing their properties; but it concludes with a provision that in ascertaining the value of the "capital shares" of such a company, the value of its physical properties shall be deducted.

Section 322 is somewhat more difficult to interpret and we therefore do not rely to any great extent on it.   Cf. *P. R.*

& *Am. Ins. Co.* v. *Gallardo, Treas., supra,* 849–50, with the
dissenting opinion therein at pp. 858, 866–67. We note that
it provides that the taxes imposed by Title IX "upon capital,
shares and property" of corporations and upon shares in
banks engaged in business in Puerto Rico shall be payable
to the Treasurer, who shall pay the proportion of such taxes
due to the municipal divisions. It also provides that such
corporations "are hereby authorized to retain the proportion-
ate taxes upon capital shares from the earnings or dividends
accruing to the owners thereof, or to cancel a proportion of
said shares sufficient to pay said taxes."

The taxpayer contends that the provision in § 322 for
retention and payment of "the proportionate taxes upon
capital shares" means that proportion corresponding to each
stockholder of the tax imposed on the "capital" of the cor-
poration by § 317. This concept, is of course, wholly foreign
to modern thinking, which draws a sharp distinction between
a tax on a corporation and a tax on its shareholders. But
the petitioner argues that this was the view of the 1902
Legislature, which regarded the stockholders—not the cor-
poration—as the owner of the corporate assets, and deemed
a tax upon the corporate property as a tax upon the shares,
collectible by using the corporation as a precursor of the
modern withholding agent.

This view would enable corporations to require their
stockholders to reimburse them for the taxes paid under
§ 317 by the corporations on the corporate property. We think
it is unnecessary in this case to consider that point and there-
fore do not pass on it.[8]

Shortly stated, the theme that runs through these Sec-
tions is (1) that whenever the Legislature envisioned the

---

[8] We likewise leave for another day the problem arising from the
fact that the comma after "capital" in the phrase "upon capital, shares
and property" in the first portion of § 322 was inserted by the 1904
amendment; it does not appear in the 1902 version. On the other hand,
the Legislature did not insert a comma in the phrase "capital shares" as
it appears in the latter portion of § 322.

taxation of shares of stock, it considered them as representing property of the corporation, despite the fact that the shares were taxed in the hands of the stockholders; and (2) that it intended to tax shares as such in the hands of the stockholders only if the corporation was not required to pay a tax on its property, whether called a tax on the property or a tax measured by its "capital" or "capital stock". That is to say, the Legislature had and has the legal power to tax both the property of the corporation and the stock in the hands of its shareholders; for reasons not legal but economic, it chose in 1902 to tax one.

We readily agree that, in exempting stock, § 291 (d) does not articulate the theme just summarized in absolutely unmistakable language. Indeed, if it did, this case would never have arisen. But ideas are prisoners of the words used to express them. And it is a rare occasion when astute lawyers cannot find some support for conflicting interpretations of complicated tax statutes. However, we have satisfied ourselves (1) that the Legislature intended by § 291 (d) to exempt stock when the corporation paid the property tax; and (2) that it used reasonably clear, albeit inept, language in § 291 (d) and related sections to express that intention. It is therefore our duty to read the statute in a manner which will accomplish this purpose of the Legislature. In so holding we are following the rule laid down in *Rullán* v. *Buscaglia*, 168 F. 2d 401, 403 (C.C.A. 1, 1948).[9]

___

[9] After citing § 19 of the Civil Code, 1930 ed., the Circuit Court at p. 403 quotes the language of Mr. Justice Holmes, sitting in the First Circuit, in *Johnson* v. *United States*, 163 F. 30, 32 (C.C.A. 1, 1908) as follows: "The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: *We see what you are driving at, but you have not said it, and therefore we shall go on as before.*" (Italics ours).

The court also quotes with approval Judge Learned Hand in *Federal Deposit Ins. Corporation* v. *Tremaine*, 133 F. 2d 827, 830 (C.C.A. 2, 1943):

Our earlier cases do not shed much light on the question involved in this case. *Union Central Life Ins. Co.* v. *Gromer*, 19 P.R.R. 856, and *Fajardo Sugar Co.* v. *Treasurer of P. R.*, 22 P.R.R. 290, affirmed in 237 F. 195 (C.C.A. 1, 1916), did not involve taxation or exemption therefrom of shares of stock. They held, Mr. Justice Del Toro dissenting, that by virtue of the 1904 amendment to § 290, personal and mortgage credits were exempt from taxation. As to the particular problem before us, the only aid is the following comment at p. 299 of the *Fajardo* case: "The Legislature, seeing that all physical property is taxed, may have desired to avoid a taxation of claims on that property to avoid duplicate taxation which so frequently falls on the borrower himself instead of on the person holding the credit." To the same effect, see the language of the dissenting opinion, at p. 310. This is in accordance with our view that the pattern consistently followed in the Political Code of 1902, as amended in 1904, was to levy the property tax only once on what the Legislature then regarded as the same thing, economically speaking.

*P. R. & Am. Ins. Co.* v. *Gallardo, Treas., supra,* comes a little closer to our problem. There we held that personal property of a domestic corporation, consisting of mortgage credits, promissory notes and *shares of stock* in other corporations, were not taxable to the corporation. The majority of the court centered its attention on whether the tax

"There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over-solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it." And, in *Cabell* v. *Markham*, 148 F. 2d 737, 739 (C.C.A. 2, 1945): "Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. *But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary;* but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." (Italics ours).

was a property or an excise tax, holding that it was a property tax. The parties here concede, and we agree, that the opinion was clearly correct on that question. But the majority of the court failed to see the only substantial points in the case; namely, (1) if credits were exempt under § 290 and (2) if the shares of stock, owned by the taxpayer, were exempt under § 291 (d).[10]

Nevertheless, despite these errors of omission on the part of the court, some of its observations were sound and in accordance with our views herein. In the first place, as we have already noted, it stated at pp. 845–46 and at pp. 854–55 that under § 317 the Treasurer has no option; in choosing between the two alternatives provided therein for valuation of personal property, he is compelled to choose the method which yields the higher valuation. Secondly, we agree that (p. 846) "it was the intention of the Legislature to tax tangible property or *its representative in intangible property*, as particularly set forth in section 317, and also that there was no intention to make the valuation a measuring rod for something other than *a tax on the capital of the corporation as constituted by its property*." (Italics ours). Thirdly, it stated accurately that (p. 850) "taxation on shares [of domestic corporations] has only been imposed upon the banks and banking institutions in Porto Rico". Finally, while that might not be the approach of today, it anticipated our present view of the 1902 thinking in the following lan-

---

[10] Only Chief Justice Del Toro saw the point. He dissented on the following ground (p. 857): "The Treasurer levied no tax whatever on the property exempt from taxation by operation of law. He considered the value of the shares of stock, which is something independent and assessable under a rational construction of Section 317 of the Political Code." While we disagree with his conclusion, Chief Justice Del Toro, unlike the rest of the court, apparently realized the nature of the problem.

Mr. Justice Franco Soto also dissented; but his dissent was predicated on the theory that the case involved a franchise, not a property tax. As the parties herein agree, this was clearly wrong, and the majority was correct in repudiating *France and N. Y. Medicine Co.* v. *Reily et al.*, 31 P.R.R. 617, to the extent that the latter case expressed the view that the tax in question is an excise rather than a property tax.

guage at pp. 853–54: "When a state desires to put a tax both upon the corporation and its shareholders the intention must be clearly displayed; otherwise the courts will interpret the statute to mean one of two things, either a tax on the corporation or a tax on the shareholders. Statutes will not be construed to authorize taxation of both property of corporations and shares of stockholders unless intent to that end is clear. *Tennessee* v. *Whitworth,* 117 U. S. 129, 134; *New Orleans* v. *Houston,* 119 U. S. 265, 277; *Loring* v. *Beverly,* 222 Mass. 331; *Board etc.* v. *Ryan,* 232 Pac. 834, and cases, 26 L.R.A. 158."

On reconsideration, this Court realized that in its original opinion it had not disposed of the questions really involved in the case; viz., whether (1) shares of stock and (2) mortgage credits were exempt. Although we then proceeded to consider these two points, we erred as to both of them. The court disposed of the first as follows: "We agree with the government that the $11,850 in shares of corporations were not shown to be exempt. Section 291 (*d*) of the Political Code exempts shares of other corporations when the property of such corporations is exempt or when the shares are taxable to said corporations. The appellant did not show at the time that its shares of stock were exempt in either way." *P. R. & Am. Ins. Co.* v. *Gallardo,* 37 P:R.R. 108, 109. And, quoting § 291 (*m*), we said that mortgage credits were similarly not exempt. As these were the results advocated by Chief Justice del Toro and Mr. Justice Franco in their original dissenting opinions, they concurred in the opinion on reconsideration.

This Court, still failing to realize that it had erred on reconsideration in the *P. R. & American* case in holding that credits belonging to a corporation were not exempt from taxation, unanimously came to the same conclusion in *P. R. Coal Co.* v. *Gallardo,* 39 P.R.R. 575. However, the latter case was reversed in *Porto Rico Coal Co.* v. *Domenech,* 41 F. (2) 183 (C.C.A. 1, 1930). The Circuit Court relied on our

earlier opinions to the contrary in the *Union Central Life* and *Fajardo* cases and on its affirmance of the latter.[11]

Before the Circuit Court had rendered its decision in the *P. R. Coal Co.* case, we repeated the error we had committed on reconsideration in the *P. R. & American Ins. Co.* case, with respect to taxability of shares of stock of domestic corporations in the hands of its stockholders. Chief Justice Del Toro wrote a unanimous opinion for the court to that effect in *Caribbean Casualty Co.* v. *Gallardo, Treas.*, 40 P.R.R. 651. This is the case on which the Treasurer relies here most heavily. It cannot be gainsaid that Chief Justice Del Toro alone was consistent throughout the gyrations our cases took. But the majority of the court was not with him, except in the *P. R. & American Ins. Co.* (on reconsideration) and the *Caribbean Casualty Co.* cases. And both these cases were decided before the Circuit Court pointed out how we fell into error in exempting credits. Moreover, that error was

---

[11] The Circuit Court said the following in 41 F.(2) 183, at 185: "This Court will always give due consideration to the construction of a local statute by a local court of last resort, but where, as in this case, it has already approved one construction of Section 317 by the Supreme Court of Porto Rico, it cannot, if appellate decisions are to serve any purpose, follow every new construction of this section by the Porto Rican court. No adequate reason is presented here for reversing our former decision."

This statement is not in accord with more recent views of the Supreme Court of the United States and of the Circuit Court itself. The later cases lay down the rule that our most recent case, although inconsistent with earlier cases, is controlling on local questions, unless it is "inescapably wrong". *De Castro* v. *Board of Comm'rs.*, 322 U. S. 451; *Ballester–Ripoll* v. *Court of Tax Appeals of P. R.*, 142 F.(2) 11, 17 (C.C.A. 1, 1944) cert. denied, 323 U. S. 723: *Torres* v. *Roldán*, 67 P.R.R. 342, 345; *Pérez* v. *District Court*, 69 P.R.R. 4, 7. However, that does not affect the result here, because this Court, as shown in the text of this opinion, subsequently reverted to the views expressed in the *Union Central Life* and *Fajardo* cases as to exemption of credits.

We also note in passing that the Circuit Court states in 41 F.(2) at 186 that our opinion on reconsideration in the *P. R. & American Ins. Co.* case is not inconsistent with the earlier *Union Central Life* and *Fajardo* cases. This statement is incorrect; but for reasons already noted, it does not affect the conclusion finally and correctly reached by us as to the exemption of credits.

particularly serious, for our purposes, because this Court and the Circuit Court in the *P. R. Coal Co.* and other cases lumped shares of stock with credits and treated them as though they were both governed by the same rule under § 290. They are, of course, quite different things, and are treated differently under the Political Code: credits are absolutely exempt (§ 290); stock is exempt in the hands of shareholders only if "taxable to the corporation itself" (§ 291(*d*)). Finally, as we have already seen, the bare statements contained in the *P. R. & American Ins. Co.* (on reconsideration) and *Caribbean Casualty Co.* opinions that the taxpayer had not brought himself within the exemption, under the circumstances of these cases, cannot be accepted. On the contrary, as already noted in our analysis of the pertinent Sections, the statute compels the conclusion that in 1902 the Legislature intended by § 291(*d*) to exempt stock of a domestic corporation when the corporation pays a tax on its property or "capital" as provided in §§ 316–17.

After the Circuit Court reversed us in the *P. R. Coal Co.* case, we realized the error we had committed on reconsideration in the *P. R. & American Ins. Co.* case, and restored the rule correctly laid down in the *Union Central Life* and *Fajardo* cases that credits are exempt. *New Corsica Centrale v. Gallardo*, 41 P.R.R. 665.[12] In this case Chief Justice Del Toro filed a concurring opinion in which he finally gave up the fight against exemption of credits, bowing to the majority opinion and the affirmance thereof by the Circuit Court. But he insisted that the unanimous opinions in the *P. R. & American Ins. Co.* on reconsideration and *Caribbean Casualty Co.* cases still represented the law *as to taxation of shares of stock.* Here, however, we find it significant that he apparently spoke for himself alone, and not for any other of the then members of the court. And, for the reasons stated

---

[12] The court explained this error by stating at p. 669 that the taxpayer filed no brief in opposition to the motion of the Treasurer for reconsideration of the original opinion in the *P. R. & American Ins. Co.* case.

herein, we do not at this time subscribe to his individual views.

It remains only to note that in *Cortada* v. *Ponce*, 47 P.R.R. 580, and *Buscaglia, Treas.* v. *Tax Court*, 65 P.R.R. 111, we ratified the rule that credits are exempt. In the latter we pointed out at p. 115, quoting the Circuit Court in the *Porto Rico Coal Co.* case, 41 F.(2) 183, 186, that if this rule, embodied in our legislation, "is not satisfactory to the People of Porto Rico, they have a Legislature with power to amend." We make the same comment with reference to the exemption of stock of a domestic corporation in the hands of its shareholders.

Our examination of the question has left us without substantial doubts as to the intention of the Legislature. In addition, our view is fortified by the administrative practice of the Treasurer. The parties stipulated that between 1926–27 and 1944–45 shares of domestic corporations in the hands of individuals or other corporations were not taxed. If a substantial doubt had existed in our minds as to whether § 291 (*d*), when read together with § § 316–17 and other Sections, conferred an exemption on stock of domestic corporations in the hands of its shareholders, it would have been dissipated by the said administrative practice of the Treasurer. *Puerto Rico Ilustrado* v. *Buscaglia, Treas.*, 64 P.R.R. 870, 890–92; *Pyramid Products* v. *Buscaglia, Treas.*, 64 P.R.R. 788.

The Treasurer first argues that this administrative practice was contrary to law. Cf. *Chabrán* v. *Bull Insular Line*, 69 P.R.R. 250, 255, and cases cited. But we have satisfied ourselves that it was in accordance with the statute. Secondly, he contends, citing *Kessler* v. *Strecker*, 307 U. S. 22, 33, that the administrative practice was not contemporaneous, uniform and continuous. In support of this argument, the Treasurer points to the *P. R. & American Ins. Co.* and *Caribbean Casualty Co.* cases, involving taxes for 1922–23 and 1924–25, respectively, in which, as we have seen, at-

tempts were made to collect taxes on such stocks because they were mistakenly assimilated to credits. But one swallow does not make a summer. A taxpayer could not establish an administrative practice in this manner. By the same token, having stipulated that the aforesaid administrative practice existed for twenty years, the Treasurer can scarcely be heard to dispute its contemporaneousness, uniformity and continuousness by citing two isolated cases which were litigated on a doubly mistaken theory.

██ There remains for solution a minor question involving 150 shares of Compañía Ferroviaria de Circunvalación de Puerto Rico, valued at $750, and eight mortgage bonds of the Iglesia Católica, Apostólica, Romana de Puerto Rico, valued at $800. The Tax Court denied relief as to these items on the ground that the petitioner did not prove in an "adequate, reliable" form that it owned these stocks and bonds. The Tax Court said: "The sole testimony of one of the officials of the appellant, without more, is not sufficient to prove its contention. Cf. *A. Fernández Hno. & Co.* v. *Tax Court*, 66 P.R.R. 570. This is even more obvious, when the witness produced to prove this point stated that the stock certificates were in the safe of the plaintiff. There is no doubt that it could have presented the best evidence and chose not to do it. The burden is on the taxpayer to demonstrate, with indubitable, reliable testimony which leaves no doubts, his right to a tax exemption."

As to the railroad stock, the Treasurer admitted in his answer that the petitioner owned 150 shares thereof, and the Tax Court said during the trial, "The fact that the plaintiff owns 150 of these shares is not in issue." The court therefore erred as a matter of law in not finding ownership of this stock in the petitioner.

As to the mortgage bonds, we agree with the Tax Court that the best evidence would have been the certificates themselves. But the court admitted the oral testimony of the President of the petitioner that it owned these bonds. This

testimony was not contradicted. Indeed, it was the only testimony on the question. Having admitted it, the court could not take refuge in the best evidence rule. Its duty was either to believe this testimony or reject it as incredible. The Treasurer does not argue here that the President of the corporation perjured himself, or even that he erred in his testimony. In fact, unless the taxpayer owns these bonds, obviously no tax is due thereon. Under these circumstances, we are justified in concluding the Tax Court erred as a matter of law in holding that there was no valid proof that the petitioner owned these bonds. We add that *A. Fernández Hermano & Co.* v. *Tax Court* involved a wholly different problem.

The judgment of the Tax Court will be reversed and a judgment will be entered holding that the shares of stock of domestic corporations and the church mortgage bonds owned by the petitioner are exempt from the property tax.

Mr. Justice Negrón Fernández did not participate herein.

